Michael COPELAND et al., Appellants,

v.

**SCHOOL BOARD OF the CITY OF PORTSMOUTH, VIRGINIA,**
et al., Appellees.

Michael COPELAND et al., Appellees,

v.

**SCHOOL BOARD OF the CITY OF PORTSMOUTH, VIRGINIA,**
et al., Appellants.

Nos. 71–1993, 71–1994.

United States Court of Appeals,
Fourth Circuit.

Argued June 7, 1972.

Decided Aug. 2, 1972.

S. W. Tucker, Richmond, Va. (Henry L. Marsh, III, James W. Benton, Jr., and Hill, Tucker & Marsh, Richmond, Va., and James A. Overton, Portsmouth, Va., Jack Greenberg, James M. Nabrit, III, and Norman Chachkin, New York City, on brief), for Michael Copeland and others.

Michael A. Korb, Jr., Portsmouth, Va., for School Board of City of Portsmouth and others.

Before HAYNSWORTH, Chief Judge, and WINTER, CRAVEN, BUTZNER, RUSSELL and FIELD, Circuit Judges, sitting en banc.

PER CURIAM:

This is a school desegregation case. Both the plaintiffs and the school board have appealed from an order establishing a plan for the operation of the schools as a unitary system. We shall consider first the appeal of the plaintiffs.

I.

The initial complaint of the plaintiffs arises out of the failure of the approved plan to provide for free transportation for pupils assigned under the plan out of their neighborhood to schools beyond walking distance from their

homes. We held in *Brewer*[1] that free transportation must be provided under these circumstances. That principle is applicable here. The additional matter of the allowance of attorney's fees in favor of the plaintiffs is reserved for future consideration.

## II.

The approved plan does not include the standardized "majority-to-minority" transfer provision. The plaintiffs contend that *Swann*[2] mandates the inclusion of such a provision in any acceptable plan of desegregation. Though we agree with the District Court that it is unlikely that this provision, if added to the plan, would be of any practical use in this case, we regard it as a better practice to include such a provision in approved plans of desegregation and the plan under review should be amended to include such provision.

## III.

The plaintiffs take exception to the operation of two special schools located in two formerly black-identified schools. One of these special schools (Mt. Hermon School) is for retarded children, both white and black. The children assigned to this school, the defendants testified, are those who test at between 30 and 75 on the standardized tests, thereby qualifying as "mentally retarded" but "trainable and educable" in special facilities. There was no inquiry into the reliability or relevance of such tests in ascertaining retardation. The argument of the plaintiffs centered primarily on the results of the assignments made on the basis of the tests administered. They argued that the fact that because 75 per cent of the students tested and assigned are black, the school should be disapproved.

The plaintiffs level a like argument against the operations of the Riddick Weaver School. This facility is for students who are "mentally normal" but with "individualized learning problems", such as "a reading deficiency or a mathematical deficiency". In essence, this is a school where the normal child who has developed some particular deficiency may, through individualized instruction in that deficiency, overcome his deficiency and resume his normal school schedule. It was testified without any serious contradiction that modern educational practices sustain this method of correcting a learning problem in the normal student. It was stated in argument, though there was no proof in the record of the fact, that the experience of the school has been good, and that, in general, those assigned are enabled within a reasonable period of specialized instruction to overcome their deficiencies and to resume successfully their normal school schedule. There was testimony by the defendants, too, that assignments to this school—even as the assignments to the Mt. Hermon School—were free of any racial discrimination. They are made, it was testified, on the basis of "psychological examinations" conducted by a professionally trained staff at the "Diagnostic, Adjustive and Corrective Center". The fairness of these examinations and the professional competency of the examiners were not specifically inquired into. Again, the plaintiffs raised primarily the point that simply because more blacks than whites are assigned to this school, the operation of the school should be disallowed in the approved plan.

It was testified by the defendants that both of the schools, to the operation of which the plaintiffs object, were designed, without any reference to race, to benefit the student with special problems. Both are stated to be sound educationally. It is obvious that a mentally retarded child, whether he be black or white, is better served by assignment to a special school where he can be given a form of education adapted to his capaci-

1. Brewer, et al. v. School Board of City of Norfolk, Virginia (4th Cir. 1972) 456 F.2d 943, decided March 7, 1972.

2. Swann v. Charlotte-Mecklenburg Board of Education (1971) 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554.

ty. Similarly, a perfectly normal child, again either white or black, who develops a learning deficiency, is manifestly given a better advantage to succeed educationally if taken out of a school, where, because of his deficiency he cannot succeed and will inevitably fall farther behind, and assigned to a special school where, along with his other work, he may be given individualized instruction in his deficiency. When assignments are made to achieve such salutary educational objectives and are in no sense the product of racial discrimination, nothing in *Brown,*[3] or any subsequent precedents enlarging on *Brown,* would invalidate such assignments. *Brown* did not proscribe sound educational practices intended to maximize educational opportunities, when applied in a nondiscriminatory manner. Merely because there may be in any school system more mentally retarded black children than there are white, or *vice-versa,* is no reason for the discontinuance of a special school particularly designed to meet the needs of such children. Any other rule would mean the sacrifice of the student and his education to the single goal of absolute, inflexible racial balance. Such a result is not constitutionally required. But it is essential that the record establish that the tests and examinations used in making assignments are relevant, reliable and free of discrimination. Griggs v. Duke Power Company (4th Cir. 1970) 420 F.2d 1225, 1233. Unfortunately, the testimony as to the character of tests and examinations used in making the assignments to these two schools is sparse and incomplete. The proceeding is accordingly remanded to the District Court for the purpose of determining whether the tests and examinations used are relevant, reliable and free of discrimination. If they are, then it is of no moment that, as a result of the use of such fair and nondiscriminatory tests, more blacks than whites proportionately are assigned to these schools. On the other hand, if the assignments are made on the basis of irrelevant or unreliable tests, then it is the duty of the Court to take appropriate corrective action.

## IV.

 Finally, the plaintiffs appeal from the denial of the allowance of a fee to their expert witness. The approval of such an allowance is committed generally to the discretion of the trial judge and is only to be disturbed for clear error. We find no such error in the disallowance.

## V.

The school board, in its turn, has appealed from that portion of the order which requires further desegregation of three elementary schools in its system. The action of the District Court, however, was clearly warranted under the circumstances.

Reversed in part, affirmed in part.

---

3. Brown v. Board of Education of Topeka, Kansas (1954) 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed 873.