**Charlie L. MEDLEY et al., Plaintiffs,**

v.

**The SCHOOL BOARD OF the CITY OF DANVILLE, VIRGINIA, et al., Defendants.**

**Civ. A. No. 71-C-44-D.**

United States District Court,
W. D. Virginia,
Danville Division.

Aug. 22, 1972.

On Motion to Stay Oct. 20, 1972.

**36**

S. W. Tucker, Henry L. Marsh, III, Richmond, Va., Jack Greenberg, James M. Nabrit, II, Norman Chachkin, New York City, J. L. Williams, Danville, Va., Charles M. L. Mangum, Lynchburg, Va., for plaintiffs.

Earle Garrett, Danville, Va., G. Kenneth Miller, Richmond, Va., for defendants.

## OPINION

WIDENER, District Judge.

This is a school desegregation case following in the wake of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. ·873 (1954), as interpreted by other cases but particularly including Green v. County School Board of New Kent County, *infra*, and Swann v. Charlotte-Mecklenburg Board of Education, *infra*. It is Danville's first time in court, its desegregation having been accomplished by voluntary compliance. Plaintiffs, Negro parents of children attending public schools in the City of Danville, insist that only the mathematical precision of the racial ratio of school population, or its near equivalent, reflected in each public school, may meet the constitutional mandate. Defendants with equal fervor take the position that geographic attendance zones which are racially non-discriminatory comply with the equal protection clause regardless of the racial makeup of the schools which may result. Between the two antithetical positions as annunciated above, both logically defensible, or in accord with one of them, the court must make its delicate choice.

The case was submitted on answers to interrogatories, exhibits, stipulations, data, and briefs. Both sides declined to submit expert or other oral testimony.

Danville's population as shown in the 1970 Census is 46,391. It is 77.02% white and 22.98% black. Census figures from 1900 to 1970 show the ratio of Negroes to total population has decreased, Danville having been 39.45% Negro in 1900, 32.64% in 1910, 26.37% in 1920, 24.83% in 1930, 31.05% in 1940, 30.18% in 1950, and 24.73% in 1960. Pittsylvania County, in which Danville is situated, has a total population of 19,774. The Census from 1900 to 1970 for Pittsylvania County shows that its percentage of Negroes has also rather steadily decreased. The county was 45.39% black in 1900, 39.77% in 1910, 35.41% in 1920, 34.28% in 1930, 30.77% in 1940, 30.89% in 1950, 34.24% in 1960, and 33.63% in 1970. Obviously, there has been no white flight from Danville with which city expension has not kept pace.

The population profile of the public schools presents only a slightly different picture. Total school population is 31.-25% Negro. The city's only high school, George Washington, which is located on the south side of the Dan River, is 30.6% Negro. Of course, plaintiffs make no complaint about the high school. Not taking into consideration the high school, which is attended by students residing on the north and south sides of the river, the schools on the north side of the river are 17.01% black and the schools on the south are 45.76% black. At present, all students, except those in high school, are assigned to schools on the basis of attendance zones. The Dan River divides the city into two sectors, and no one attendance zone includes students living on both sides of the river. As these figures show, the Negro population of Danville is not evenly dispersed throughout the city, but is more numerous on the south side of town below the Dan River.

As the chart below shows, during the 1971–1972 school year, Danville operated three junior high schools. One of them, Bonner, is located on the north side of town. It was 19.27% Negro. The two junior highs on the south side, Langston and Lee, together had a 44.17% Negro population. The following chart shows the junior high school enrollment by race for the 1971–1972 school year:

| SCHOOL | SIDE OF RIVER | GRADES | CAPACITY | ENROLLMENT | WHITE | NEGRO | % NEGRO |
|--------|---------|--------|----------|------------|-------|-------|---------|
| Bonner | N | 7–9 | 1200 | 1240 | 1001 | 239 | 19.27 |
| R.E. Lee | S | 7–9 | 815 | 712 | 370 | 342 | 48.03 |
| Langston | S | 7–9 | 800 | 568 | 349 | 219 | 38.55 |
| TOTALS | | | | 2520 | 1720 | 800 | 31.74 |

[A6348]

The school board has advised the court of its intention to alter the attendance zones of Langston and Lee, the two junior high schools on the south side of the river, for the 1972–1973 school year. It stated that if a change were not made, each of these schools would be less representative of the Negro population for the 1972–1973 school year. The 1972–1973 proposed plan will change the feeder schools into these two junior highs so as to more precisely reflect the racial ratios south of the Dan River. The school board has recognized that a desirable and practical way of achieving desegregation is by controlling the source of students for the junior high schools. This also has the advantage, recognized by educators, of keeping the students together through as many years of school as possible. With the alteration, Lee, 48.85% Negro in 1971–1972, will be 46.61% Negro, and Langston, 38.68% Negro in 1971–1972, will be 41.89% Negro. The total junior high population on the south is 44.44% black, and the total junior high and elementary student population on the south is 45.-76% black.[1]

1. The chart outlining the proposed changes and the defendants' answer to interrogatories differ slightly as to the numbers of black and white students at Langston and Lee in 1971–1972. The figures in the answer to interrogatories show that in 1971–1972 Lee was 48.03% Negro rather than 48.85%, that Langston was

During the 1971–1972 school year, Danville operated fourteen elementary schools, seven on the north side of town and seven on the south side. The elementary school population was 15.86% Negro on the north side of town and 46.59% Negro on the south. Data for each of the elementary schools operated during the 1971–1972 school year follows:

1971–1972

ELEMENTARY SCHOOLS

| SCHOOL | SIDE OF RIVER | GRADES | CAPACITY | ENROLLMENT | WHITE | NEGRO | % NEGRO |
|---|---|---|---|---|---|---|---|
| Bellevue | N | 1–6 | 375 | 276 | 175 | 101 | 36.59 |
| G.L.H. Johnson | N | 1–4 | 665 | 498 | 457 | 41 | 8.23 |
| I.W. Taylor | N | 5–6 | 540 | 262 | 247 | 16 | 6.10 |
| Park Ave. | N | 1–6 | 330 | 309 | 261 | 48 | 15.53 |
| Stonewall Jackson | N | 1–6 | 480 | 310 | 253 | 57 | 18.38 |
| Woodberry Hills | N | 1–6 | 480 | 436 | 404 | 32 | 7.33 |
| Woodrow Wilson | N | 1–6 | 600 | 342 | 251 | 91 | 26.60 |
| SUBTOTAL | N | 1–6 | 3470 | 2433 | 2047 | 386 | 15.86 |
| Cedarbrook | S | 1–6 | 425 | 412 | 392 | 20 | 4.85 |
| E.A. Gibson | S | 3–6 | 960 | 394 | 83 | 311 | 78.93 |
| Forest Hills | S | 1–6 | 360 | 254 | 192 | 62 | 24.40 |
| Grove Park | S | 1–2 | 300 | 267 | 54 | 213 | 79.77 |
| J.L. Berkeley | S | 1–3 | 330 | 296 | 65 | 231 | 78.04 |
| Schoolfield | S | 1–6 | 680 | 500 | 438 | 62 | 12.40 |
| Westmore-land | S | 4–6 | 950 | 326 | 84 | 242 | 74.23 |
| SUBTOTAL | S | 1–6 | 4005 | 2449 | 1308 | 1141 | 46.59 |
| TOTAL | N+S | 1–6 | 7475 | 4882 | 3355 | 1527 | 31.27 |

[A6349]

38.55% Negro rather than 36.68% Negro, and that the south side junior high population was 44.17% Negro rather than 44.44%. These differences, although unexplained, are unimportant.

For the 1972–1973 school year, the school board has established a kindergarten program. This program is not required by any Virginia Statute, and no child is required to attend. As this program was not in operation during the 1971–1972 school year, the chart showing the attendance at the various elementary schools for the last school year does not reflect any kindergarten students. In an affidavit, filed August 9, 1972, the Superintendent of schools stated that 441 children have registered for the program, although he did not know at that date exactly how many children will actually participate. On the south side, the kindergarten grades will be located at Cedarbrook, Schoolfield, Forest Hills, Grove Park, and Berkeley, and all children will be assigned to schools on the basis of the elementary attendance zones, as if they were entering the first grade. On the north side of the river, the kindergarten grades will be located at Bellevue, Woodrow Wilson, Stonewall Jackson, and G. L. H. Johnson. All children will be assigned to schools according to the elementary attendance zones, except that, because of the anticipated near full-capacity enrollments in the non-kindergarten grades at Woodberry Hills and Park Avenue, kindergarten students who would normally attend those schools will attend G. L. H. Johnson.

No issue is made of the summer school program or of the Head Start program, plaintiffs having conceded that each of these programs is operated in a fully desegregated manner. Plaintiffs have not complained of the operation of the extracurricular activities in any of the schools. Similarly, as plaintiffs admit that the faculties are realistically desegregated, no complaint is made concerning the assignments of teachers. The chart, which follows, shows that the teachers have been assigned on an almost completely mathematically precise basis:

<u>1971–1972</u>

TEACHERS

| High School | Total Teachers | Negro Teachers | % Negro Teachers | % Negro Students |
|---|---|---|---|---|
| Geo. Washington | 110 | 23 | 20.90 | 30.6 |
| **Junior High Schools** | | | | |
| Langston | 32 | 12 | 37.50 | 38.55 |
| Bonner | 58 | 20 | 34.48 | 19.27 |
| R.E. Lee | 40 | 10.5 | 26.25 | 48.03 |
| SUBTOTAL FOR JUNIOR HIGH SCHOOLS | 130 | 42.5 | 32.69 | 31.74 |
| **Elementary Schools** | | | | |
| (North) | | | | |
| Bellevue | 13 | 5 | 38.46 | 36.59 |
| G.L.H. Johnson | 20 | 6 | 30 | 8.23 |
| I.W. Taylor | 11 | 2 | 18.18 | 6.10 |
| Park Avenue | 12 | 4 | 33.33 | 15.53 |

[A6987]

| Elementary Schools | 1971-1972 TEACHERS | | | |
|---|---|---|---|---|
| | Total Teachers | Negro Teachers | % Negro Teachers | % Negro Students |
| (North) | | | | |
| Stonewall Jackson | 14 | 4 | 28.57 | 18.38 |
| Woodberry Hills | 17 | 5 | 29.41 | 7.37 |
| Woodrow Wilson | 14 | 4 | 28.57 | 26.60 |
| SUBTOTAL FOR N. ELEMENTARY | 101 | 30 | 29.70 | 15.86 |
| (South) | | | | |
| Cedarbrook | 15 | 5 | 33.33 | 4.85 |
| E.A. Gibson | 21 | 6 | 28.57 | 78.93 |
| Forest Hills | 12 | 4 | 33.33 | 24.40 |
| Grove Park | 11 | 3 | 27.27 | 79.77 |
| J.L. Berkeley | 14 | 4 | 28.57 | 78.04 |
| Schoolfield | 21 | 5 | 23.80 | 12.40 |
| Westmoreland | 16 | 7 | 43.75 | 74.23 |
| SUBTOTAL FOR S. ELEMENTARY | 110 | 34 | 30.90 | 46.59 |
| TOTAL ELEMENTARY | 211 | 64 | 30.33 | 31.27 |
| GRAND TOTAL | 341 | 106.5 | 31.23 | 31.25 |

[A6350]

———◆———

Plaintiffs, during the course of this action, have complained about the assignment of professional personnel, other than teachers. By pre-trial order entered on July 12, 1972, plaintiffs were required to set out, with particularity, wherein such assignments were constitutionally invalid. On July 26, 1972, plaintiffs filed a pleading stating that they no longer contend that the administrative staffs are unconstitutionally constituted. The administrative staffs, composed of principals, assistant principals, guidance counselors, and libra-rians, were 23.08% Negro during the 1971–1972 school year. An additional Negro guidance counselor has been employed at the high school for the coming school year, and, in addition, the school board intends to employ another black administrator if funds are available.

The profile of the Danville school system has changed significantly during the past several years. Prior to May, 1965, the City of Danville operated two senior high schools, two junior high schools, two schools with grades one through eight, and eleven elementary schools. It is

agreed that all of the schools were virtually all-black or all-white at that time, although figures showing the ratio of Negro and white students do not appear in the record. An indication of the extent of segregation at that time is shown by the following statement in the school board's "Statement of Policies and Plans for Compliance Under Title VI of the Civil Rights Act of 1964," issued on May 18, 1965:

"Six of these schools were integrated during the past two years with approximately 21 Negro children transferring or initially assigned to formerly all-white schools."

By the statement of May 18, 1965, the school board also adopted a freedom of choice plan. Students entering the first grade, junior high school, senior high school, and the twelfth grade, and students being initially admitted in the city's public school system were assigned to schools they requested. All other students were assigned to the schools they attended the preceding year, but were permitted to make application for placement in another school. Danville operated under a *Jefferson County* type plan in which each student was notified in writing each year of his right to transfer to another school in which his race was in a minority.

In March, 1969, the Department of Health, Education and Welfare approved the school board's plan for desegregation. That plan supplemented the freedom of choice plan by geographically zoning five elementary schools and expanding faculty integration for the 1969–1970 school year. Although the extent of desegregation under the 1969 plan was not achieved under the 1965 freedom of choice plan, some progress was achieved. Of the eighteen schools in operation 1969–1970, thirteen were integrated to at least some extent and 17% of the Negro students attended integrated schools. The plan, as subsequently modified by the school board and again approved by HEW, included numerous changes for the 1970–1971 school year. George Washington High School became the only school serving grades ten, eleven, and twelve. Bonner Junior High was constructed in 1970 and was attended by all junior high students on the north side of town. The two other junior high schools were geographically zoned. The elementary schools that had not been zoned in 1969–1970 were either zoned or paired, and one all-Negro elementary school was closed. In 1970–1971, no student attended an all-black or all-white school, and no student attended a school that was less than 21% white. The plan contained a majority to minority transfer provision, permitting any student attending a school in which his race was in the majority to elect to attend another school where his race was in the minority if space were available in that school. The plan also called for complete faculty desegregation. After this plan was implemented, HEW representatives visited the Danville school system and approved the plan in operation. In July, 1971, HEW suggested that the school board review its desegregation plan in view of Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). The school board rezoned the attendance area for one elementary school which, because of changing residential patterns, was becoming a one race school. But HEW informed the school board that this plan did not appear to accomplish the greatest possible degree of integration. The day following this letter from HEW, the present suit was filed, and the school board has been unable to obtain further suggestions from the Department of Health, Education and Welfare. But, up until the time the present suit was filed, the school board worked closely with HEW and was commended by HEW for its efforts in desegregating the school system.

The following chart which compares the white-black ratio in all the schools for the 1971–1972 school year with such ratio for the 1969–1970 school year, demonstrates the substantial progress that has been made in Danville:

| School | Side of River | 1969-1970 | | | | 1971-1972 | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Grades | White | Negro | % Negro | Grades | White | Negro | % Negro |
| High Schools & Jr. High Schools | | | | | | | | | |
| Geo. Washington | S | 9-12 | 2183 | 134 | 5.78 | 10-12 | 1544 | 682 | 30.63 |
| Langston | S | 9-12 | 0 | 784 | 100.00 | 7-9 | 349 | 219 | 38.55 |
| Bonner | N | Erected in 1970 | | | | 7-9 | 1001 | 239 | 19.27 |
| Robert E. Lee | S | 7-9 | 845 | 92 | 9.81 | 7-9 | 370 | 342 | 48.03 |
| Woodrow Wilson | N | 7-8 | 488 | 45 | 8.44 | | | | |
| SUBTOTAL FOR HIGH SCHOOLS & JR. HIGH SCHOOLS | | | 3516 | 1055 | 23.08 | | 3264 | 1482 | 31.22 |
| Elementary (North) | | | | | | | | | |
| Bellevue | N | 1-6 | 263 | 34 | 11.44 | 1-6 | 175 | 101 | 36.59 |
| GLH Johnson | N | 1-6 | 801 | 1 | .12 | 1-4 | 457 | 41 | 8.23 |
| IW Taylor | N | 1-8 | 0 | 202 | 100.00 | 5-6 | 246 | 16 | 6.10 |
| Park Avenue | N | 1-6 | 246 | 66 | 21.15 | 1-6 | 261 | 48 | 15.53 |
| St. Jackson | N | 1-6 | 396 | 20 | 4.80 | 1-6 | 253 | 57 | 18.38 |
| W.F. Grasty | N | 1-6 | 0 | 193 | 100.00 | Not in oper. since June, 1970 | | | |
| Woodberry Hills | N | 1-6 | 408 | 12 | 2.85 | 1-6 | 404 | 32 | 7.33 |
| Woodrow Wilson | N | | | | | 1-6 | 251 | 91 | 26.60 |
| SUBTOTAL N. ELEMENTARY (A) | | | 2114 | 528 | 19.98 | | 2047 | 386 | 15.86 |
| (South) | | | | | | | | | |
| Cedarbrook | S | 1-6 | 369 | 24 | 4.04 | 1-6 | 392 | 20 | 4.85 |
| E. A. Gibson | S | 3-6 | 0 | 649 | 100.00 | 3-6 | 83 | 311 | 78.93 |
| Forest Hills | S | 1-6 | 280 | 28 | 9.09 | 1-6 | 192 | 62 | 24.40 |
| Grove Park | S | 1-6 | 244 | 7 | 1.99 | 1-2 | 54 | 213 | 79.77 |
| J.L. Berkeley | S | 1-6 | 225 | 47 | 17.27 | 1-3 | 65 | 231 | 78.04 |
| Schoolfield | S | 1-6 | 448 | 1 | .22 | 1-6 | 438 | 62 | 12.40 |
| Westmoreland | S | 1-8 | 0 | 760 | 100.00 | 4-6 | 84 | 242 | 74.23 |
| SUBTOTAL S. ELEMENTARY (B) | | | 1566 | 1516 | 49.19 | | 1308 | 1141 | 46.59 |
| TOTAL FOR ALL SCHOOLS | | | 8226 | 3347 | 28.92 | | 6619 | 3009 | 31.25 |

[A6351]

(A) If the eighth grade students attending I. W. Taylor during the 1969–1970 school year are not included in the north side elementary subtotal for that year, the north side elementary schools were 18.66% Negro in that year.

(B) If the eighth grade students attending Westmoreland during the 1969–1970 school year are not included in the south side elementary subtotal for that year, the south side elementary schools were 47.99% Negro in that year.

It should be particularly noted that the school board, having taken into consideration physical barriers, boundaries, and other such factors, drew the attendance zones on a geographical basis in order to effectuate a neighborhood school system. Examination of a map, which shows the residences of all white and Negro students in Danville, as well as the elementary attendance zones, demonstrates that these zones have not been drawn in order to maintain segregated schools or to hinder desegregation. For example, Taylor previously was an entirely black school and now is a predominantly white school. Rather, it appears that if any consideration has been given to race in the formulation of these zones, the school board has considered race only in order to achieve racial balance within the zones while adhering to the neighborhood school concept. The Stonewall Jackson attendance zone, as an instance, is a narrow zone which extends approximately three-fourths of the way down the northeastern border of the city. The northern portion of this zone is almost exclusively white and the bottom portion is nearly all black. While the configuration of this zone facilitates the safety and ease of student transportation, as U. S. Route 29 is the western border of this zone, it also accomplishes the creation of a zone that closely approximates the black-white ratio of the student population on the northern side of the city. For the 1970–1971 school year, attendance zones were created to accommodate the pairing of Berkeley, a predominately white school in 1969–1970, with Westmoreland, an all-black school in 1969–1970. Also, in 1971, the Woodberry Hills attendance zone was altered to halt the decline in black enrollment at that school.

The Danville school board does not own or operate school buses, and no students are transported to school at public expense. Those students who do not live within walking distance of their respective schools are transported either by their parents in private cars or by commercially operated buses. Bus tickets are sold at reduced rates to school children. There has been no evidence of any hardship or complaint in getting children to school, not at public expense, using the 1971–1972 attendance zones.

As is obvious from the above description of Danville's school system, the school board has drawn the attendance zones for all of its schools, except for the high school, in such a manner that students are not required to cross the Dan River. A description of the City of Danville is critical to the understanding of this present assignment scheme and to any relief this court may order. The court has taken a view of the entire city on which the attorneys were invited to attend but declined. Danville, a highly industrialized and commercial city, located in southern Virginia, is divided by the Dan River into two areas of approximately equal geographical size. Through the middle of the city, the river makes a horseshoe curve. Located on the south side of this curve is a region in which is concentrated a substantial part of the Negro population on the south side of the Dan River. This concentration of Negroes is bound to have received impetus from the location of three low-cost housing developments below the horseshoe curve, all of which have been built since World War II. Two of those projects were constructed by the federal government and the third

was federally financed. A substantial portion of the Negro population of the north side of the city is located in the northeast section of the city on the north side of the horseshoe curve. The plaintiffs have not pointed to any city ordinance which has tended to cause or effectuate residential segregation or to any use of racially restrictive covenants in property deeds. Neither are the public housing developments segregated.

The Traffic Control Division of the Danville Police Department, in 1971, completed a traffic survey of the streets in Danville and of the five bridges joining the southern and northern banks of the river, which has been obtained from the State Highway Department and is included with the record for convenience. In a twenty-four hour period, Robertson Bridge in the western section of Danville was crossed by 15,710 vehicles, Aiken Bridge on the western end of the horseshoe curve by 21,840 vehicles, Union Bridge in the middle of the horseshoe turn by 13,550 vehicles, Main Street Bridge on the eastern end of the horseshoe curve by 12,990 vehicles, and Worsham Bridge, just below Main Street Bridge, by 7,300 vehicles. The survey also shows that heaviest traffic on these bridges occurs during the hours that children are going to and coming from school. The three bridges which join the central city area on the south bank with the north side of the city and which are in the horseshoe immediately above the concentration of Negro population in the south bank are the Aiken Bridge, the Union Street Bridge, and the Main Street Bridge. There is no walkway on the Aiken Bridge, a very narrow sidewalk on the Union Street Bridge, and a walkway on the Main Street Bridge. However, there are no sidewalks on the north side of the Union Street Bridge. At the northern end of the Main Street Bridge, U. S. Route 58, which runs in an east-west direction, intersects with one of the main north-south thoroughfares in the city. The Robertson Bridge in the west-

ern end of the city has a walkway on one side of the bridge. There are no sidewalks on either end of this bridge and at the northern end of this bridge is the intersection of U. S. Routes 58 and 29A. The Worsham Bridge on the eastern end of Danville has a walkway. Three of the bridges, Robertson Bridge, Union Street Bridge, and Main Street Bridge, are situated near commercial mills and are particularly busy at the time of shift changes at those mills, 8:00 a. m. and 4:00 p. m., the same time children are going to and coming from school.

Reinforcing the division of Danville by the Dan River is a four lane highway which parallels the Dan River on its north bank from city limit to city limit, a distance of approximately four and one-half miles. This heavily traveled highway, known as Riverside Drive in Danville, is U. S. Route 29A for more than a mile and U. S. Route 58 from city limit to city limit. While it is a four lane highway, at most of the intersections there are turn lanes, thus, making six lanes of traffic. Like the river, this highway must be crossed to reach any school on the north side of town from the south side and vice versa.

Riverside Drive is not immediately adjacent to the river, there being a strip of land on the north side of the river between the river and the highway. The highway, the river, the strip of land in between, together with the streets adjacent to the river on the south side of the river, form a corridor which is at no point much less than a quarter of a mile in width and is at most places approximately a third of a mile wide. Except for approximately a mile on the westernmost end of the city, there are virtually no residences in the strip between the river and the highway, and even the residential strip in the western end is very sparsely populated. Rather, this strip is, for approximately three and one-half miles, a highly developed commercial area. The commercial development is on

both sides of Riverside Drive, and there are no sidewalks of any consequence on either side of Riverside Drive.

The traffic survey shows the number of vehicles at various points on Riverside Drive in a twenty-four hour period as 27,410, 25,450, 20,370, 14,800, and 18,520. The heaviest traffic occurs at the time children are going to and from school. The speed limit is forty miles an hour on Riverside Drive, and there is considerable tractor-trailer and other through traffic.

Also buttressing the division of the city, occasioned by the Dan River and Riverside Drive, are similar, four lane, commercially developed streets on the south side of the river. These streets, Memorial Drive, which for approximately a mile is U. S. Route 29A, Union Street, Canal Street, and their extensions, all closely parallel the river for nearly four miles. Except for a very small area, approximately a third of a mile long and five hundred feet in depth, in the middle of the horseshoe curve, there are no residences in the area between the river and these streets. The traffic survey indicates that these streets are heavily traveled. At random points on these streets, the number of vehicles in a twenty-four hour period were 12,880, 19,080, 16,330, 12,160, and 7,830. Few sidewalks exist along this commercially developed property on the south bank of the river.

Defendants strongly contend that the present school system in Danville, Virginia is a unitary system and that, accordingly, the plaintiffs are entitled to no relief. The Fourth Circuit, in Adams v. School District Number 5, Orangeburg County, 444 F.2d 99 (4th Cir. 1971), considered several desegregation cases, including one which arose in Roanoke, Virginia, Green v. School Board of the City of Roanoke. The Fourth Circuit found unacceptable the plan approved by the district court for elementary schools in Roanoke. That

plan yielded a school system not dissimilar to the one presently in operation in Danville. Examination of the record in *Green* shows that the Roanoke student population was 25% Negro and 75% white. The school board's elementary school plan, which was implemented by the district court with only minor changes, resulted in three schools having less than 10% white students, eleven schools with less than 10% black students, and eleven schools with 10% or more Negro students and 25% or more white students. See Green v. School Board of the City of Roanoke, 316 F. Supp. 6, 9 (W.D.Va.1970). In Danville, where the school population is 31.25% Negro, each of four elementary schools for 1971–1972 was less than 10% Negro and each of four other elementary schools is more than 74% Negro. Of the seven elementary schools on the north side of the city, only two approximated the black-white student ratio of that side of the city and only one approached the city-wide ratio. Of the seven elementary schools on the south side, only one approached the black-white student composition of the south side of the city and only approached the city-wide percentage. Additionally, although the school board has taken major steps in undertaking its affirmative duty to convert to a unitary school system, further dismantling of the previously segregated system, as the comparison with the Roanoke plan indicates, is required, and can be achieved with minimal disruption to the schools, their faculties and staffs, the students and their parents, and to the school system as a whole.

In the way of relief, plaintiffs insist that the only acceptable solution is that the school system be redesigned so that it will be mathematically precise or very, very short of mathematically precise. On April 14, 1972, plaintiffs presented to the defendants a chart

". . . showing the numbers of children whose transfer from their re-

spective areas of residence and whose enrollments in schools more distant from their homes would achieve the maximum degree of desegregation of the elementary schools."

As the plaintiffs stated, they did not purport ". . . to suggest the details or extent of a remedial plan." On July 31, 1972, plaintiffs included in their memorandum a plan in non-chart form which embodies the same changes. Neither plan sets forth the grades of the children it purports to move, the method of selection of the children to be moved, or any details concerning the transportation of the children to be moved. The plaintiffs have not submitted any plan at all concerning the junior high schools. The substance of plaintiffs' plan is embodied in the following chart:

| School and Capacity | RETAIN B | W | RECEIVE B | W | SEND B | W | SEND TO | NET B | W | % B |
|---|---|---|---|---|---|---|---|---|---|---|
| Grove Park(S) Gibson(S) 1260 | | 216 | | 451 | 235 | | 217 Johnson(N) 13 Forest Hill(N) | 289 | 667 | 30.23 |
| Schoolfield(S) 680 | 72 | | 84 | | | 80 | Grove-Gibson(S) | 156 | 360 | 30.23 |
| Johnson- (N) Taylor (N) 1205 | 60 | | 217 | | | 96 | Grove-Gibson(S) | 277 | 638 | 30.27 |
| Woodberry(N) 480 | 32 | | 79 | | | 166 | Westmoreland(S) | 111 | 254 | 30.41 |
| Westmoreland(S) Berkeley (S) 950 | 220 | | | | 341 | 257 | 18 Schoolfield(S) 79 Woodberry(S) 78 Cedarbrook(S) 26 Park Avenue (N) | 220 | 503 | 30.42 |
| Cedarbrook(S) 425 | 225 | | | 78 | | 181 | Westmoreland(S) | 98 | 225 | 30.34 |
| Forest Hills(S) 360 | 190 | | | 13 | | 51 | Grove-Gibson(S) | 81 | 190 | 29.88 |
| Park Avenue(N) 330 | 174 | | | 26 | | 95 | Grove-Gibson(S) | 75 | 174 | 30.12 |
| TRANSPORT | | | | | 492 | 679 | | | | |
| Wilson (N) (Bellevue) 600 | 138 | | | | 59 | 107 | | 138 | 318 | 30.26 |
| Jackson(N) 480 | 57 | | 54 | | | 12 | | 111 | 254 | 30.41 |

[A6352]

Defendants have submitted no plans of their own, but, at the suggestion of the court, have outlined proposals which combine all fifth and sixth grades on each side of the river, without transporting students across the river or between other schools. These plans follow:

| SOUTHSIDE | GRADE | NEGRO | WHITE | % NEGRO |
|---|---|---|---|---|
| Grove Park | K-4 | 95 | 115 | 45.23 |
| Schoolfield | K-4 | 57 | 314 | 15.36 |
| Forest Hills | K-4 | 51 | 110 | 31.68 |
| Cedarbrook | K-4 | 17 | 308 | 5.23 |
| Gibson | 5-6 | 332 | 421 | 44.09 |
| Westmoreland | K-4 | 678 | 106 | 86.48 |
| TOTAL | | 1230 | 1374 | 47.23 |

ALTERNATE PLAN - (Keeping Berkeley open)

| SOUTHSIDE | | | | |
|---|---|---|---|---|
| J. L. Berkeley | K-1 | 232 | 41 | 84.98 |
| Westmoreland | 2-4 | 446 | 65 | 87.28 |

| NORTHSIDE | | | | |
|---|---|---|---|---|
| Bellevue | K-4 | 85 | 152 | 35.86 |
| Woodrow Wilson | K-4 | 57 | 159 | 26.39 |
| Stonewall Jackson | K-4 | 52 | 196 | 20.97 |
| Woodberry Hills | K-4 | 25 | 293 | 7.86 |
| Park Avenue | K-4 | 36 | 173 | 17.22 |
| I. W. Taylor | K-4 | 52 | 504 | 9.35 |
| GLH Johnson | 5-6 | 110 | 641 | 14.65 |
| TOTAL | | 417 | 2118 | 16.45 |

[A6353]

Although the plaintiffs contend otherwise, mathematical precision is not constitutionally required, as the following language from Swann v. Charlotte-Meck-

lenburg Board of Education, *supra*, shows:

"If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse. The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.

\* \* \* \* \* \*

"In light of the above, it should be clear that the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law." Id. 402 U.S. at 24, 26, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554.

Chief Justice Burger, in considering whether to grant a stay in a desegregation case, had this to say about *Swann* and mathematical precision:

"Nothing could be plainer, or so I had thought, than Swann's disapproval of the 71%–29% racial composition found in the *Swann* case as the controlling factor in assignment of pupils, simply because that was the racial composition of the whole school system. Elsewhere in the *Swann* opinion we had noted the necessity for a district court to determine what in fact was the racial balance as an obvious and necessary starting point to decide whether in fact any violation existed; we concluded, however, that 'the very limited use made of the mathematical ratios was within the equitable remedial discretion of the District Court.' 402 U.S. at 25, 91 S. Ct. at 1280." Winston-Salem/Forsyth County Board of Education v. Scott, 404 U.S. 1221, 1228–1229, 92 S.Ct. 1236, 1240, 31 L.Ed.2d 441 (1971).

■ However, the approval of a plan which achieves less desegregation than that proposed in an alternate plan necessitates a showing that the alternate plan is impracticable. *Adams, supra* at 101 of 444 F.2d. Thompson v. School Board of City of Newport News, 465 F.2d 83 (4th Cir. 1972). The practicability of a plan must be assessed in light of all the circumstances present and in recognition that each school system has unique characteristics, Green v. County School Board of New Kent County, 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). In particular, *Swann* notes that the demographic configuration of the community, the "congested and complex traffic patterns," and the permanence of the solution, as well as the distance of travel, time required for travel, health, safety, and age of the students, and the educational process as a whole are among the factors which district courts may consider. *Id.* 402 U.S. at 14, 91 S. Ct. 1267.

In Davis v. Board of School Commissioners of Mobile County, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971), the Supreme Court reviewed a desegregation plan for Mobile, Alabama, whose student population was 42% Negro. Desegregation in the school system had been complicated by virtue of the division of the school system by a major north-south highway and the geographic concentration of 94% of the Negro students on the east side of that highway. Schools on the east side were 65% Negro and those on the west were 12% Negro. The elementary school plan approved by the Fifth Circuit did not provide for any combination of the schools on the east side of the highway with those on the west side and resulted in 64% of all Negro elementary school students attending nine schools which were over 90% black. Additionally, over half of all Negro junior and senior high school students attended all-black or nearly all-black schools. The Supreme Court remanded, finding that inadequate consideration had been given to possible combinations of and cross-busing between the eastern and western schools. The Supreme Court, however, noted that, on remand, "the practicalities of the situation [must be taken]

into account." *Id.* at 37, 91 S.Ct. 1289, at 1292, 28 L.Ed.2d 577.

■ *Thompson, supra,* also makes it clear that any peculiar geographic division of the school system, the geographical concentrations of racial groups, and "any traffic hazards or other complexities of transportation" are factors which the district court may properly take into consideration in evaluating proposed plans. *Id.* 465 at 88. In *Thompson,* the Fourth Circuit reviewed a desegregation plan for the elementary schools in Newport News, Virginia. The school district was a consolidation of the old cities of Newport News and Warwick, with 80% of the Negro population living in the old city of Newport News geographically located in the southern tip of the school district. In order to effectuate racial balancing of the elementary schools, it would have been necessary to have extensive cross-busing between the northern and southern regions of the districts, and students would have had to have been transported across two major, congested highways. This, the district court had refused to do. Rather, it approved a plan pairing grades three through seven and assigning students in grades one and two to neighborhood elementary schools. Negroes constituted 36.1% of the total elementary school population and the plan approved left nine of the thirty elementary schools with black majorities ranging from 51.-4% to 64.8%. Of the twenty-eight elementary schools serving grades one and two, under the plan implemented by the district court eight remained all-white and four remained all-black. The Fourth Circuit remanded the case so that the district court might determine whether or not feasible alternatives to the neighborhood assignment plan existed. However, the court reviewed many other decisions approving plans which, because of geographic and demographic peculiarities of the school districts, assigned elementary students to neighborhoood schools and achieved substantially less than mathematically precise desegregation. The court concluded:

"While it seems clear from this review of the authorities that, under proper circumstances, the assignment of the primary grades to neighborhood schools is not *per se* unacceptable, such assignment must rest on specific findings of fact establishing that, on account of ages of the pupils and difficulties of transportation, no other plan affording greater integration is practical." *Id.* at 89.

■ The court has thoroughly considered the plaintiffs' plan and specifically finds that it is impracticable. Because of the geographic location of racial groups in Danville, the plaintiffs' plan involves virtually all the elementary schools in Danville and requires extensive cross-transportation of students between the elementary schools on the north side of town with those on the south side of town. The plan requires that hundreds of young children cross the highly congested and hazardous corridor created by the Dan River, Riverside Drive, and the streets on the south of the river, at a time when this corridor is the most congested and the most hazardous and at the time of shift change for three mills located in the corridor. The plaintiffs have not addressed themselves to the method of transportation which would be needed to implement their plan. It is noted that in some cases the distance between the elementary schools on the north and south sides is minimal. For example, Woodberry Hills in the north is within a mile of Westmoreland and Berkeley, both of which are located on the south side of the city. Three of the city's five bridges lie in between the Woodberry Hills attendance zone and the Westmoreland-Berkeley attendance zone. One of those bridges, the Aiken Bridge, has no walkway for pedestrian traffic. Union Bridge has a walkway, but there are no sidewalks on the streets north of that bridge. The third bridge, the Main Street Bridge, has a pedestrian walkway, although that bridge is a highly dangerous one as its northern end forms the intersection of Main Street and U.

S. Highway 58. Thus, although the direct distance between the schools is a mile, the walking distance computed via Union Street Bridge is approximately two and one-half miles. It is obvious that implementation of the plaintiffs' plan, because of the geographic location of the bridges, the lack of sidewalks and the hazardous traffic conditions, would require the Danville school board, which presently operates no school buses and has no funds appropriated to it for the operation of school buses, to undertake a program of extensive busing and cross-busing. The court recognizes that such transportation is among the useful and necessary tools that may be employed in the process of dismantling segregated school systems. *Swann, supra; Davis, supra.* The order which this court will enter in this case will provide for transporting some students. However, the court does not believe that, unless compelling circumstances require otherwise, the youngest elementary students should be bused for the sole purpose of achieving mathematical precision. The court is of opinion that, under the facts of this case, students in the fourth grade and lower grades should not be so transported. See Hightower v. West, 430 F. 2d 552, 555 (5th Cir. 1970). And, as no necessity has been shown for busing the youngest elementary children in Danville, the court's order will only affect the oldest elementary students and will not require that any students be bused across the river or the thoroughfares paralleling the river. In any event, whether in buses, in private cars, or walking, under the plaintiffs' plan, children of tender years must cross dangerous bridges with insufficient walkways, exceedingly congested streets and highways in a completely commercial area with virtually no sidewalks. The court considers particularly dangerous Riverside Drive, or U. S. Highway 58, which is at least six lanes at most intersections and is traveled by much tractor-trailer and other through traffic, moving at rapid speeds. The court is simply not willing to put the safety of young children in jeopardy in order that mathematically exact racial ratios be achieved.

The court is of opinion that a plan establishing one fifth and one sixth grade for each side of the city and leaving the kindergarten through the fourth grades in neighborhood schools is a much safer and more feasible plan. Westmoreland with the capacity of 950 and Gibson with the capacity of 960 each can easily serve all the fifth and sixth grades on the south side of the river in the foreseeable future. Approximately 750 pupils are expected to be enrolled in the fifth and sixth grades on the south side in 1972–1973. Because Gibson is more centrally located and is nearer the population center, the court recommends that it be chosen. In their outline of the court's plan, the defendants have suggested that Berkeley be closed. If Berkeley remains open, there will be two majority black schools on the south side. The court, therefore, believes that it should be closed. Perhaps it may be used by the school board for some other purpose.

On the north side, G. L. H. Johnson has the largest capacity, although it has a capacity for only 665 students. The school board has stated that Johnson is the only school which can serve all fifth and sixth graders. Based on the attendance figures for the 1971–1972 school year, there will be approximately 750 students in those grades. The court does not wish to adopt a plan which will cause overcrowding of any school and will, thus, shorten the longevity of the plan. Rather, it is the desire of the court to adopt a plan, the utility of which will at least have a chance to remain for many years to come. Therefore, the court concludes that the implementation of the plan requires that all fifth grade students attend one school and all sixth grade students attend another school. As there may be valid reasons with which the court is unfamiliar that dictate other choices, the court suggests, but does not require, that I. W. Taylor be selected as the fifth grade school and that Woodrow Wilson, in ad-

dition to serving the kindergarten through fourth grade students for its attendance zone, serve as the sixth grade school. Both of these schools are located near the population centers of the northern region of Danville. The use of Taylor rather than Johnson as the fifth grade school would permit Johnson, which is more centrally located in the Johnson-Taylor attendance zone, to continue to serve the first through fourth grades, in that zone, as well as the new kindergarten grade.

The plan here set out is basically an extension of the plan voluntarily put in operation in the seventh and eighth grades by the school board and substantially improves the school system as required by applicable decisions. The fifth and sixth grades will precisely reflect the black-white ratios of students on each side of the river. None of the elementary schools will be less than 5% Negro, and only three of the elementary schools, G. L. H. Johnson (9.35% Negro), assuming it remains as a kindergarten through fourth grade school, Woodberry Hills (7.86% Negro), and Cedarbrook (5.23% Negro), will be less than 10% black. In 1971–1972, one elementary school was less than 5% black and three others were less than 10% black. Under the new plan, only one school, Westmoreland, will be majority black, but in 1971–1972, there were four schools more than 75% black, attended by over 65% of the Negro elementary students. Under the new plan, less than 40% of the Negro elementary students will attend the compulsory grades, grades one through four, in the majority black school, and only 41.16% of the Negro elementary students will attend grades kindergarten through four in the majority black school. Besides the three elementary schools that will be less than 10% black and the one that will be majority black, the nine remaining elementary schools will range from 14.65% to 45.23% black in a school system in which the city-wide elementary student population will be 32.04% Negro, the north side elementary population, 16.-

45% Negro, and the south side elementary population, 47.23% Negro.

It should be noted that the school board, in outlining the plan suggested by the court, altered somewhat the attendance zones of Woodrow Wilson, Stonewall Jackson, and the schools surrounding Westmoreland in order to improve the racial balances at those schools. Even with those changes, the racial composition of Westmoreland remains disturbing. It is hoped that utilization of a majority to minority transfer provision will help to correct the situation at Westmoreland. The majority to minority transfer permits any student in any grade who is assigned to a school in which his race is in the majority to elect to attend another school in which his race is in the minority if space is available at the other school.

■ To implement this plan, the school board, taking into consideration any hazardous traffic conditions, and any other factors which may affect walking conditions, must provide free transportation for fifth and sixth grade students assigned to schools beyond normal walking distance of their homes and for any students who elect, under the majority-to-minority transfer provision, to attend schools which are beyond normal walking distance of their homes. No other transportation furnished at public expense is required by this opinion.

The court believes that the plan it is adopting is more feasible than one which transfers students across the Dan River. The court plan avoids the dangerous north-south transportation of students. It can be implemented with practically no disruption to the school system. It will not put a disproportionate share of the burden of desegregation upon Negro students. All four of the schools suggested as locations for the fifth and sixth grades, and particularly Westmoreland, Gibson, and Woodrow Wilson, are geographically located close to both the population centers and to the major Negro residential areas. There is

some evidence of changing residential patterns within each sector of the city, but such changes cannot affect the racial compositions of the fifth and sixth grades. Of course, it may be argued that the effectiveness of the court's plan could be put in future jeopardy by substantial increases in the Negro enrollment in the south side elementary schools or by substantial decreases in the Negro enrollment in the north side schools. However, comparison of the 1969–1970, 1970–1971, and 1971–1972 enrollments and the anticipated enrollment in 1972–1973 does not suggest that the schools south of the Dan River are becoming progressively more black or that on the north side are becoming more white. Only the oldest elementary students will attend schools other than their neighborhood schools. The youngest elementary school children will attend schools closest to their homes and will not have to be bused to their assigned schools. Students who live in the same area will attend the same school. Students will not have to travel past other schools having the same grades to reach their assigned schools. These incidental advantages of the court's plan are factors which should contribute to the community satisfaction with, and reception of, any plan to achieve a unitary school system and are factors which have been deemed important by courts considering those plans. *Thompson, supra*; Copeland v. School Board of City of Portsmouth, 464 F.2d 932 (4th Cir. 1972); Hart v. County School Board of Arlington County, 459 F.2d 981 (4th Cir. 1972); Hightower v. West, *supra*.

Although the plaintiffs have contended that the racial characteristics of the elementary schools can only be eliminated by some combination of schools on the south side with those in the north, their plan also involves transferring south side elementary students to other schools on the south side of the city. Even considering that portion of their plan as a separate plan, it does not achieve as great a degree of desegrega-

tion in the school system as a whole as does the court's plan. Furthermore, the court believes that the plan it is adopting is more practicable than one transferring students within each section of the city, for many of the reasons outlined above. In particular, unlike a plan transferring students within each sector of the city, it does not require that the youngest elementary children attend schools other than their neighborhood schools. Furthermore, it is a more economical, more permanent, and less disrupting solution.

The plaintiffs have offered no plans with respect to the junior high schools. Bonner, on the north side of the city, was 19.27% Negro in the 1971–1972 school years. With the recent changes in the attendance zones for Langston and Lee, by controlling the source of their students, those schools will be, respectively, 41.89% and 46.61% Negro in the 1972–1973 school year. As each of the junior high schools now almost exactly reflects the racial composition of the junior high population of the side of the city in which it is located and as any other racial composition in those schools would necessarily involve transferring students across the river, the court deems it unnecessary to alter those school zones.

As *Davis, supra*, makes clear, the ultimate test for any plan, considering the uniqueness of the school system in which it is to operate, is its effectiveness. Throughout his entire school career, each child in the Danville public school system will attend schools in which the faculties and administrative staffs are completely integrated. In no school will any child be excluded from participation in extracurricular activities on account of his race. Each child will attend a senior high school, the racial composition of which is mathematically precise. While in grades five through eight, he will attend schools which nearly exactly reflect the racial composition of the side of the city in which he lives, no one of which varies

greatly from the city-wide student racial composition. No black child will attend a majority black school after he completes the fourth grade, and every black child from the fifth grade through high school will attend schools in which his race is in the minority. Each student, while in grades kindergarten through four, will attend his neighborhood school, and no child in those grades will be exposed to an all-black or all-white school. Only one elementary school, out of thirteen, will be majority black, and only three elementary schools will be less than 10% black. All black children and all white children, from the day they enter school until the day they graduate, will attend integrated schools. Furthermore, any student in any grade who is assigned to a school in which his race is in the majority may attend, if he so desires, another school in which his race is in the minority if space is available at the other school. When the plan outlined above is implemented, the court is of opinion that the last vestiges of state-imposed segregation will be wiped out in the public schools of the City of Danville. Bradley v. School Board of City of Richmond, 462 F.2d 1058 (4th Cir. 1972).

An order is this day entered consistent with this opinion.

### On Motion for Stay

This court, by order entered August 22, 1972, as modified August 25, 1972, required certain changes in the assignment of pupils in the public school system of the City of Danville. A part of the changes, which are set forth in full in the plans to implement the court's orders, filed October 2, 1972, consisting of two letters from the School Board to the court, and as further acted on by the court by order entered October 2, 1972, required the transportation of a part of the students in grades 5 and 6 in such school system.

The opinion of the court, entered August 22, 1972, noted that Danville theretofore had placed in effect a system of school attendance zones which were based wholly on geographical considerations and were not discriminatory on account of race. There was also theretofore in effect a minority to majority transfer provision. Not on account of racial discrimination in pupil assignment as it presently existed, but in order to eliminate the last vestiges of a state imposed system of racially segregated schools, the court required the establishment of 5th and 6th grade centers on the north and south sides of the Dan River which divides the city. In order to effect such 5th and 6th grade centers, the School Board would have been required to furnish transportation to a part of the 5th and 6th grade students of the city but to no others. The court declined to require the transportation of any students from kindergarten through the 4th grade, and declined to order the transportation of any students solely to achieve a racial balance in the schools which would approximate the racial composition of the school population as a whole. The School Board had previously consolidated all high schools into one school for the entire city and had established junior high school attendance zones which, with minor variations, accurately reflected the school population racial balance existing on the north and south sides of the Dan River, respectively.

On August 31, 1972, the plaintiffs filed a motion to amend or alter the decision of the court, F.R.Civ.P. 59.

On August 31, 1972, the defendants filed a motion for rehearing styled "Motion to vacate or amend judgment," which was treated by the court as having been filed both under FRCP 52 and FRCP 59.

On August 31, 1972, the defendants moved the court to stay the proceedings until a notice of appeal may be filed and, if so, thereafter until final disposition of the appeal.

On September 5, 1972, the court entered an order overruling the motion to alter or amend the judgment filed by the plaintiffs and the motion for a rehear-

ing or to vacate or amend the judgment filed by the defendants.

Noting that no notice of appeal had been filed as of September 5, 1972, the court stayed the effect of the orders of the court entered August 22, 1972 and August 25, 1972 until thirty days from September 5, 1972, the date of the entry of the order, and indicated it would take up the matter of a stay during the pendency of an appeal should it become appropriate.

On October 2, 1972, the defendants obviously having decided not to appeal the orders of the court entered August 22, 1972 and August 25, 1972, filed with the court their plans for implementing the decision of the court, which were partially approved and partially modified by order of the court entered October 2, 1972.

On October 4, 1972, the plaintiffs filed their notice of appeal, and on October 16, 1972, the defendants filed their notice of cross-appeal and a motion to stay the proceedings.

■ The court is of opinion that the motion to stay the proceedings pending the appeals is well taken and ought to be granted for the reasons which are set forth below.

First. While the orders of the court and the plans for implementing the orders of the court, taken together, will not cause any massive disruption of the school system in the City of Danville, the record shows beyond a shadow of a doubt that the School Board of the City of Danville will be required to spend large sums of money to fit its schools in order to physically accommodate the shift in students occasioned by compliance with the orders of this court.

For example, extensive renovation of the cafeteria at Westmoreland School to increase its capacity from 500 or 600 to more than 800 students is required; additional restrooms must be added to Westmoreland School to meet minimum state requirements; a three-story structure on Westmoreland campus which has been closed for two years will require general renovation, which has been verified by the court in its view; a covered walkway must be constructed to connect the various buildings to the cafeteria; and arrangements must be made on the north side of the river for taking care of the K–4 students dislodged by establishing a 5th or 6th grade center.

■ The court also bears in mind that it has neither the right nor the obligation to interfere with the operation of any public school system unless the school system is being operated in violation of the Constitution or laws of the United States.

While the dollar amounts of money necessary for implementing the orders of the court are not shown in the record, the court takes notice that the revisions in the school accommodations in the Danville school system made necessary by the orders of the court, which have been partially set out above, would require the expenditure of thousands of dollars of funds. Also, Berkeley School, now presently used, will be closed under the plans of implementation envisioned by the School Board and approved by the court.

Should the plaintiffs prevail in their appeal, it is probable, or at the very least possible, that the changes in the physical accommodations of the school system required by the court's plan will either be unnecessary, or different changes will be made necessary by any future plan which may be required by a court decision different from the one presently proposed. Such contingency would certainly result in an uncalled for waste of public funds which would be to no avail whatsoever. In addition to such waste, the School Board may then be required to expend additional money to meet the provisions of a different court required school attendance plan. In either event, plaintiffs' success in an appeal may very well result in either a single expenditure with no resulting benefit or a double expenditure with a single benefit. In the opinion of the court, such waste of public funds is not required, and it

would be an abuse of discretion by this court not to grant the stay requested, independently of the existence of § 803 of Public Law No. 92–318 of the 92nd Congress, Second Session. The court is reinforced in its opinion by the fact that the plaintiffs were offered an opportunity to present oral evidence but declined to do so, leaving the court to decide the matter wholly on the basis of records and the physical makeup of the city involved. The plaintiffs have put the question to the court as squarely as they may that the only way to achieve Constitutional compliance is by a racial distribution of students in each school which reflects the racial school population of the city, or, in the alternative, that transportation of public school students, regardless of their age or geographical factors, is necessary from the highest to the lowest grade. The plaintiffs obviously take the position that such transportation of students is mandatory, rather than discretionary, with the district court.

The court considers these hard and fast positions taken by the plaintiffs in the case to be contrary to controlling precedent as has been previously set forth in the opinion of the court.

Second. A stay is required by § 803 of Public Law No. 92–318, 92nd Congress, Second Session.

The plaintiffs take the position that the statute is not applicable in view of Swann v. Charlotte-Mechlenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), in cases of *de jure* segregation.

The statute requires a stay:

" . . . in the case of any order on the part of any United States district court which requires the transfer or transportation of any student or students from any school attendance area prescribed by competent state or local authority for the purposes of achieving a balance among students with respect to race . . . until all appeals in connection with such order have been exhausted or, in the event no ap-' peals are taken, until the time for such appeals has expired. This section shall expire at midnight on January 1, 1974."

The language of the statute is completely unambiguous and a reference to the legislative history, described by the plaintiffs as confused, would be meaningless.

■ The statute requires a stay of orders of district courts which require the transfer or transportation from any school attendance area prescribed by local school boards if the purpose of the order is to achieve a balance among students with respect to race. The whole purpose of this suit filed by the plaintiffs, in which they have been partially successful, is to achieve a balance among students with respect to race, which is exactly within the precise wording of the statute. The court is of opinion that the orders of this court previously entered requiring 5th and 6th grade attendance centers on the north and south sides of the Dan River is an order of a district court requiring transfer or transportation of students from school attendance areas prescribed by the Danville School Board for the purpose of achieving a racial balance. The purpose of achieving racial balance, of course, is to eliminate the last vestiges of a state imposed system of segregated schools.

The plaintiffs further contend that if the statute is applicable to this proceeding, then it is invalid as contrary to the 5th and 14th amendments to the Constitution and the doctrine of separation of powers.

Without here examining at length the voluminous Constitutional arguments, especially as to separation of powers, the court is of opinion that Congress may so regulate such proceedings in federal district courts. The amount in controversy is regulated in diversity suits, 28 U.S.C. § 1332, and in some federal question cases, 28 U.S.C. § 1331; district courts may not enjoin the assessment, levy, or collection of taxes under state law where state courts provide a speedy and effi-

cient remedy, 28 U.S.C. § 1341; certain rate orders of state agencies may not be enjoined, 28 U.S.C. § 1342; and the Norris-LaGuardia Act limits the jurisdiction of federal courts in labor disputes. Other examples are legion. No reason is given why Congress should not have the power to require a stay of a district court if it has the power to limit the jurisdiction of district courts.

The court has considered the memorandum submitted by plaintiff and the authorities cited therein. In addition, the court has considered the following authorities: F.R.App.P. 8; F.R.C.P. 62; 3 Barron & Holtzoff (Wright ed.), Federal Practice & Procedure, § 1371, et seq., particularly the 1971 supplement; 7 Moore's Federal Practice, § 62.05; Coppedge v. Franklin County Board of Education and authorities cited therein, 293 F.Supp. 356 (E.D.N.C.1968); Long v. Robinson, 432 F.2d 977 (4th Cir. 1970). The court is of opinion that irreparable injury to the defendants would result if defendants were not granted a stay pending appeal in this case, and that little or no harm would result to plaintiffs if the stay is granted. The school system is presently geographically desegregated. The court is further supported in its opinion by the fact that plaintiffs' have been largely successful in their action, and, being unsatisfied, have nevertheless taken an appeal to seek complete success.

■■■ Plaintiffs contend that § 803 of the statute does not apply to this case, and, even if it does, that it constitutes an unwarranted intrusion by the Congress into the affairs of the judiciary. The court is of opinion that § 803 by its exact terms is applicable. The court is further of opinion that the section is not an unwarranted intrusion into the judiciary and instead is a Constitutionally permissible Congressional limitation on the powers of this court. The Congressional control of the jurisdiction of lower federal courts is well summarized in Wright on Federal Courts (2 ed.) as follows:

"Congress has considerable discretion in dealing with the jurisdiction of the lower federal courts. It can provide a particular court for hearing certain questions and deny all other courts the power to consider that question, even to the point of precluding raising the invalidity of a regulation as a defense in a criminal action, where there was a court provided in which the invalidity of the regulation might have been asserted. Congress can provide that cases within the judicial power shall come to the federal courts, by removal, rather than in their original jurisdiction. *It can take away from the courts power to grant a particular remedy or to enforce a particular kind of contract.*" [Emphasis added.] Wright 1970 ed. at 23.

The court has considered Mapp v. Board of Education, etc., 341 F.Supp. 193 (D.C.E.D.Tenn., 1972), and agrees with that opinion that § 803 of the statute is applicable, but does not agree with the opinion if it may be construed to require a three-judge court to pass on the validity of the statute under 28 U.S.C. § 2282. The stay sought does not enjoin an Act of Congress.

In conclusion, the court is of opinion that the stay ought to be granted for the following reasons:

1. F.R.App.P. 8 and F.R.C.P. 62 allow a district court to grant a stay in a civil action. The financial change of position on the part of the defendants required by the orders of the court, which would probably be wholly wasted, and certainly partly wasted, if the plaintiffs succeed in their appeal, makes the denial of a stay inequitable.

2. Section 803 of Public Law No. 92–318, 92nd Congress, Second Session, requires a stay.

These reasons for granting a stay are separate and independent of each other, and either supports its issuance. Because of equitable considerations requiring a stay, it should not expire at midnight January 1, 1974.

In accordance with the foregoing, it is accordingly adjudged and ordered as follows:

## I

The effect of the orders of this court entered August 22, 1972, August 25, 1972, and October 2, 1972 shall be, and they hereby are, stayed until all appeals in connection with such orders have been exhausted.

## II

The School Board of the City of Danville having previously placed in effect a minority to majority transfer plan, it is ordered that this stay not apply to such transfer plan, which shall remain in full force and effect.

## III

No bond is required for the stay hereby granted.